Christine JOSEPHSON, Plaintiff,

v.

KIMCO CORP., Defendant.

No. 4:00–CV–30673.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 15, 2003.

Roger J. Kuhle, John O. Haraldson, Kuhle Law Office PC, West Des Moines, IA, for Plaintiff.

Edward J. Krug, Krug Law Firm, Cedar Rapids, IA, Matthew B. Schiff, James W. Hulbert, Linda C. Kramer, Schiff & Hulbert, Chicago, IL, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WALTERS, Chief United States Magistrate Judge.

This matter is before the Court on defendant's motion for summary judgment. This is a Title VII, 42 U.S.C. § 2000e, et seq., failure to promote sex discrimination and retaliation action with pendent state claims under the Iowa Civil Rights Act (ICRA), Iowa Code ch. 216, et seq. Plaintiff also claims a constructive discharge. Plaintiff originally filed a petition in the Iowa District Court for Polk County. The case was removed to this Court by the defendant pursuant to 28 U.S.C. § 1441. The parties consented to proceed before a United States Magistrate Judge and the case was referred to the undersigned for all further proceedings on February 5, 2002. See 28 U.S.C. § 636(c).

### I.

A party is entitled to summary judgment only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Helm Financial Corp. v. MNVA Railroad, Inc.*, 212 F.3d 1076, 1080 (8th Cir.2000) (citing Fed.R.Civ.P. 56(c)); *accord Bailey v. USPS*, 208 F.3d 652, 654 (8th Cir. 2000). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999).

In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the nonmoving party based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir.2000). The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir.2001)); *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir.1999); *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir.1993).

Employment discrimination cases examine the employer's motivation for a particular employment action. Proof of motivation "often depend[s] on inferences rather than on direct evidence." *Mems v. City of St. Paul*, 224 F.3d 735, 738 (8th Cir.2000) (citing *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994)). *See also Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir.2000); *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir.1999). For this reason, motions for summary judgment in employment actions must be approached with caution. Still, summary judgment "remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.), *cert. denied*, 528 U.S. 872, 120 S.Ct. 174, 145 L.Ed.2d 147 (1999); *see Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) ("summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case").

## II.

Except where indicated the following facts are undisputed or are as viewed in the light most favorable to plaintiff Josephson. As a preliminary matter, the Court notes that some of plaintiff's denials of facts put forward in Kimco's statement of facts are not supported by citation to the summary judgment record. Where this is so, and defendant has appropriately supported a statement of fact with reference to the record, the local rules provide the statement should be taken as true. LR 56.1(b).[1]

---

1. Kimco also correctly notes that plaintiff has not made her record citations to an appendix as required by LR 56.1(b)(e). Compliance with the local rules concerning summary judgment motions is particularly helpful to the Court and counsel should take care to do so in the future. However, as plaintiff's citations are to depositions and other material also contained in defendant's appendix, this omission has not been detrimental.

Kimco Corporation is a building contract maintenance company which performs janitorial labor services for large and small buildings. Its home office is in Norridge, Illinois and there are regional offices in Des Moines, the Quad Cities, Peoria, Bloomington and Springfield. At the time in question Leo Ford was regional vice president in charge of the managers and the operation of the regional offices. Gary Haines began at Kimco in March 1997 as a district manager in the Des Moines office, then became a regional manager.

Plaintiff Christine Josephson was hired by Ford in February 1998 to work as office manager at Kimco's Rock Island office with an annual salary of $18,000. She worked there for two months, reporting directly to Ford. When Josephson's husband was transferred to Des Moines, Ford transferred her to the Des Moines office to replace an office manager who had recently been let go. Ms. Josephson assumed the Des Moines position on April 13, 1998, reporting to Haines, who reported to Ford. Her job duties at the Des Moines office included answering the phone, handing out checks, sending payroll in, keeping inventory, handing out applications, filing, ensuring the proper paperwork was filled out when someone was hired, putting hiring packets together and turning them over to area managers, typing up bid proposals and correspondence, ordering supplies, and general duties running an office. Ford visited Des Moines frequently, and had a good relationship with Josephson.

There were two area manager positions assigned to the Des Moines office, but one or both were vacant at various times relevant to this action. Area manager duties included attending daily meetings conducted by the regional manager; taking corrective action on all customer complaints; reporting any problems with materials, equipment and supplies; training replacement personnel; inspecting and complet-ing inspection reports; controlling the amount of hours worked on accounts assigned in accordance with standard hours; scheduling, supervising and inspecting all operations in an account; ensuring all jobs were properly staffed and supplied; making verbal report to the regional manager; and appointing and providing appropriate training to building supervisors. (App. 152). Area managers were assigned responsibility for specific buildings. The two Des Moines area managers split twenty-eight to thirty buildings. The work hours of an area manager were typically from 3:00 p.m. until midnight or so. Sometimes area managers worked into the morning hours and had to attend early afternoon meetings. (App.39).

Haines had hired Joshua Fellner as an area manager. Generally Ford hired all area managers under his jurisdiction. Fellner was the only area manager Ford did not hire or interview. After Fellner was a "no show" for a couple of days, Haines terminated him for job abandonment. Fellner's last day of work was October 7, 1998. The other Des Moines area manager position had been vacant for some time. After Fellner left, both positions were vacant and Haines was left to do their jobs. (App.7, 8, 134–35).

Prior to Fellner leaving, Haines worked fourteen to sixteen hours a day; after Fellner left Haines at times worked twenty hours a day. (App.135–36). Josephson told Haines and Ford she would help Haines take care of some of Fellner's buildings. There is a dispute about on what basis and for what reasons Josephson assumed some of Fellner's duties, but she has testified she performed area manager duties at six or seven of the buildings for which she was paid additional compensation. (App.35). Josephson performed the additional work nightly after 5:30 p.m. following performance of her office manager duties. Josephson did not perform the full

range of area manager duties, however. She was not required to meet with customers or do inspections. Josephson performed the additional work from October 12, 1998 to November 4, 1998. (App.80–81).

There is also a factual dispute as to the quality of Josephson's work performing area manager duties. Josephson testified she was told by Haines she would make a great area manager. Haines and Ford have testified she put too much time into the job and did not follow directives. (App.36, 38–39, 136).

Kimco sought a replacement for Fellner. Josephson knew this. (App.39). Ford testified that, as there were no area managers in Des Moines and they needed applicants, it is probable Kimco advertised the position. (App.9–10). It is undisputed Josephson did not make a formal application for the job. (App.40). However, the Court takes as true Josephson's deposition testimony that while she was still performing some of the area manager duties to assist Haines, she told Haines she would be interested in filling the position. She followed up with him by asking if the position had been filled and whether the company was still looking. (App.39). According to Josephson, it was then Haines responded by saying "I think you would be a great area manager." (*Id.*) Josephson also testified Haines made a comment during the same general time period that he did not think the open area manager position "would be a good place for a woman to be working." (App.41). It is undisputed Josephson did not tell Ford she was interested in replacing Fellner, but she says she had had general conversations with him previously about her interest in becoming an area manager. (*Id.*) It was unclear to Josephson who was to make the

hiring decision for Fellner's replacement. (*Id.*)

Ford hired Brad Hartschen as the new area manager. (App.136). Hartschen's first day at work as November 2, 1998. Ford had had contact with Hartschen at a local hotel where Hartschen worked when Ford stayed in town. (App.9). Hartschen was working as a "jack of all trades." (*Id.*) Ford recruited Hartschen for the area manager position when Hartschen said something to Ford about looking for another line of work. Ford told Hartschen to go down to the office and turn in an application. (*Id.*) Hartschen's application is not in the summary judgment record. Ford and Haines interviewed Hartschen together. (*Id.*) Hartschen had no experience in janitorial work, but in Ford's view, knew customer service and appeared to be readily trainable. (App.10).

In late October Josephson learned from Haines that Hartschen had been hired. According to Haines, Josephson became upset, stating Kimco should have hired within the company and that she might have wanted the job. (App.136).[2] Shortly afterward, in early November, Josephson expressed her unhappiness to Ford about not getting the position. (App.46). Josephson felt she was more qualified for the job because she was familiar with the company, knew the suppliers, the accounts and the cleaners. (App.41).

At about the time Hartschen started work, and in apparent response to Josephson's complaints about his hiring, both Haines and Ford talked to Josephson about filling another area manager position. Josephson denies their discussions concerned the other Des Moines position. Josephson has testified that in her discussions with Ford, Ford told her the job took a lot of time and that he thought her

---

**2.** Haines testified in his deposition this was the first he knew Josephson was interested in replacing Fellner.

daughter might be a problem in view of the long hours required. (App.47). Ford testified he offered Josephson the other open Des Moines area manager position when she and Ford met on December 11, 1998 to discuss a reprimand by Haines. (App. 16; *see infra* at 10). Josephson admits Ford offered an area manager position in January 1999, but described the offer as vague. She testified Ford did not answer her questions about the location of the position or the responsibilities of the job. (App.48). She declined the offer because, as she said she told Ford

> I didn't really feel the job existed. I wasn't given any specifics on where it would be. It could have been in Springfield, it could have been in Peoria, it could have been 90 days as far as I was concerned. There wasn't any—and I know there's not a guarantee that anything is going to be long-term in a cleaning business, but it was just offered to me, I felt, just because I had said something about not getting the other area manager's position. As—I don't know as what exactly you'd call it.

(App.50).

Both sides seem to agree that after Hartschen was hired there was a deterioration in the relationship between Haines and Josephson. There is a dispute in the summary judgment record about the attitude of each toward the other, and about Josephson's attitude toward her job. Both claim to have been ignored by the other. Josephson states she was told by other employees that Haines referred to her as a "simple secretary," a "nothing," and a "nobody," and told them not to talk to her anymore. She alleges one employee who "stuck up" for her was fired, although she does not know why the employee was terminated. There were a few complaints

about Josephson's job performance from other employees. Josephson alleges she was no longer paid mileage for errands in her personal car, although Kimco's business records show otherwise. Ultimately Josephson received a written reprimand from Haines on December 4, 1998, for several instances of "poor work performance" and "insubordination." (App.43, 93). In this regard Josephson claims she was treated differently than men as other male employees did not receive reprimands for conduct like that for which she was reprimanded. (App.43).

Josephson complained to Ford about the reprimand. Ford came to Des Moines and met with Haines and Josephson on December 11, 1998. They discussed the reprimand and Ford told Haines and Josephson he was not going to allow the reprimand to stand. It was removed from Josephson's personnel file. Ford told Josephson he was willing to work with her to try and solve some of the problems at the office. The subject of the area manager came up again. Josephson told Ford she thought she was more qualified than Hartschen and could do the job. Kimco's minimum qualifications for the job are not in the summary judgment record.

On December 11, 1998, the same day as her meeting with Ford, Josephson signed and dated a complaint with the Iowa Civil Rights Commission. As noted, Josephson had a good relationship with Ford. When he noticed she was still upset after the December 11 meeting, Ford told Josephson "why don't we all of us just get along? Why don't we do this?" When he spoke to Josephson in January 1999 about the area manager job he told her he would help her and make things work out. He repeated the same sentiment in early February. (App.50).[3] While still working for Kimco

---

3. Josephson's denial of the February conversation is not supported by citation to the record. LR 56.1(b).

Josephson looked for other work by submitting applications and going to an employment agency. She sent a letter and resume to one potential employer on January 26, 1999.

The last day Josephson worked at Kimco was February 5, 1999. On that date she claims Haines ordered her to do office dishes before she left. (App.53). The next day she called Ford at home about the incident. (*Id.*) Josephson decided not to return to work because she considered it too unpleasant to work for Kimco any further. (App.54). She was not fired. Ford offered to keep her on the payroll for two weeks until she found a job. Josephson called Ford on February 12, 1999 and told him she had found a job. He kept her on the payroll until February 19, 1999 and paid her vacation pay on top of that.

Josephson began working for Ruan Transportation on February 22, 1999. Her starting salary was $14.35 an hour. In 2001 she made $37,000 and in 2000 she made $32,000. An area manager at Kimco started at $24,000 to $26,000. A second area manager for the Des Moines Kimco office was hired in February 1999.

### III.

The claims in this case target two alleged adverse employment actions: (1) the failure to promote Josephson to area manager to fill Fellner's position; and (2) retaliation resulting in a constructive discharge. The Court examines each in turn.

### A. *Failure to Promote*

There is no direct evidence of discriminatory intent on the part of the promotion decisionmaker Ford. Josephson concedes the appropriate analytical framework for the present motion is that articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S.

248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff first has the burden of establishing a prima facie case which creates "a legal presumption of unlawful discrimination." This shifts the burden to defendant to articulate "a legitimate, nondiscriminatory reason" for the employment action at issue. *Bogren v. Minnesota*, 236 F.3d 399, 404 (8th Cir.), *cert. denied*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *O'Sullivan v. Minnesota*, 191 F.3d 965, 969 (8th Cir.1999)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Plaintiff must then produce sufficient evidence from which the fact finder could conclude that defendant's reason is not the true reason but a pretext for discrimination. *O'Sullivan*, 191 F.3d at 969. Claims under ICRA are analyzed in essentially the same fashion. *Vivian*, 601 N.W.2d at 873; *Hamer v. Iowa Civil Rights Commission*, 472 N.W.2d 259, 263–64 (Iowa 1991); *Hy–Vee Food Stores v. Civil Rights Commission*, 453 N.W.2d 512, 516 (Iowa 1990).

■ A prima facie case of failure to promote requires plaintiff to show (1) membership in a protected group; (2) she was qualified for and applied for an available position; (3) she was rejected; and (4) promotion [or in this case hiring] of a similarly situated person outside the protected group. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir.2002); *Dotson v. Delta Consolidated Indus., Inc.*, 251 F.3d 780, 781 (8th Cir.2001)(citing *Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir.1998)). Defendant's motion challenges plaintiff's ability to establish the second and third elements of her prima facie case.

■ Kimco argues first that Josephson has produced no evidence that she was qualified to be an area manager. It is true there is no evidence in the record as to what the formal qualifications for the job

were. However, the evidence (according to Kimco) that Josephson was twice offered an area manager's job, as well as the statement attributed to Haines that Josephson would "be a great area manager" are enough to create a genuine issue of fact on Josephson's qualifications. In its dealings with Josephson prior to her departure Kimco never suggested she was not qualified to be an area manager. Moreover, Kimco, which presumably has established qualifications for the job, has not identified any which excluded Josephson from consideration.

■ Josephson admittedly did not submit a formal application for the area manager job. This failure, however, will not necessarily prevent her from establishing the prima facie case if she nonetheless "made every reasonable attempt to convey [her] interest in the job to the employer." *Chambers v. Wynne School Dist.*, 909 F.2d 1214, 1217 (8th Cir.1990) (quoting *Equal Employment Opportunity Comm'n v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir. 1990)). Our court of appeals has explained what this generally means is that

> formal application will not be required to establish a prima facie case if the job opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application.

*Chambers*, 909 F.2d at 1217; *see Gentry v. Georgia–Pacific Corp.*, 250 F.3d 646, 652 (8th Cir.2001)(citing *Chambers* ). Kimco's contention that the area manager's job was advertised is not disputed. Though this takes Josephson's case outside the scope of the exception to the formal application requirement as articulated in *Chambers* and *Gentry*, *Chambers* put forward a general rule which should not, as with the *McDon-*

*nell Douglas* framework generally, be given a mechanical, ritualistic application. Our court of appeals has said a number of times that the "elements of a prima facie case are flexible and vary depending on the factual situation giving rise to the dispute." *Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir.1999)(quotations and citations omitted).

The prima facie question in this case ultimately boils down to whether the fact finder could find Josephson made "every reasonable attempt to convey" her interest to Kimco and, more generally, whether the particular circumstances, if unexplained, create an inference of gender discrimination. *Keathley,* 187 F.3d at 921.

The question is close, but the Court ultimately is not convinced that the absence of a formal application by Josephson is dispositive of the prima facie case on the facts here. It is not clear that a formal application was a prerequisite to consideration for the position. Ford testified in his deposition that he told Hartschen to submit an application, but it is not shown that he ever did so. More significantly, under Kimco's version of events when Josephson expressed her dissatisfaction with Hartschen's hiring and her own interest in the position, it offered her an area manager position. It tendered the offer based on her oral expression of interest without requiring a formal application. This is evidence from which the jury might decide, if it believed Josephson, that her expressions of interest in the job to Haines, and more generally to Ford, were reasonably sufficient under Kimco's practices for her to be considered. Haines was not the final decisionmaker, but he was Josephson's immediate superior, had hired the predecessor for the position which was being filled, and, according to Ford, participated in the interview with Hartschen for the job. The jury could infer that Haines had some

involvement in the hiring/promotion decision at issue, which seems reasonable if he was to supervise the area manager.

Kimco also disputes that Josephson was rejected, but this reflects Kimco's position that it did not know of Josephson's interest. Viewing the record favorably to Josephson, her testimony about her expressions of interest to Haines is sufficient to make an issue on the rejection element.

██ Proceeding to the second and third stages of the *McDonnell Douglas* analysis, Kimco's justification for the promotion decision is that "Ford did not hire [her] for the area manager position ... filled by Hartschen because he was unaware that Josephson wanted ... this position." (Def. Mem. at 12). As noted, Ford's awareness of Josephson's interest, directly, or through Haines, is a disputed issue. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Still, even if there is a fact issue as to whether Kimco's reason is pretextual, the evidence overall must permit "a reasonable inference that [a prohibited motive] was a determinative factor in the adverse employment decision." *Cronquist v. City of Minneapolis,* 237 F.3d 920, 926 (8th Cir.2001)(citing *Rothmeier v. Inv. Advisers, Inc.,* 85 F.3d 1328, 1336–37 (8th Cir. 1996)).

At this stage also, the evidence is not strong, but it is minimally sufficient, together with the issue about the truth or falsity of Kimco's justification, to avoid summary judgment. Josephson relies on her claimed superior qualifications, the fact she had been doing part of the job, her testimony that Haines favored men over women in his handling of reprimands, Haines' statement that the position given Hartschen was not a good one for a woman, and Ford's alleged discouragement of her interest because the needs of her daughter might interfere. Kimco responds that an assessment of the relevant qualifications of Josephson and Hartschen should not be second-guessed, but it never made such an assessment. It argues Ford, not Haines, made the decision, but the record permits an inference Haines had some input in the decision and Haines had made a statement evidencing a discriminatory preference with respect to the job. Kimco contends that the fact Ford, after Josephson complained, promptly offered her an area manager job is against any inference of gender discrimination. This is true, but Josephson has testified he did not really offer her a specific job, was evasive on the details, and discouraged her with the comments about her daughter. Kimco also points to the fact most of the area managers under Ford were female, however, this general statistic is not conclusive with respect to a specific hiring decision. There are too many factual disputes bearing on the issue of pretext for the Court to enter summary judgment on the failure to promote claim.

B. *Retaliation*

██ To prove a prima facie case of retaliation, plaintiff must show (1) that she engaged in protected activity; (2) that she was subjected to adverse employment action; and (3) "that the adverse action was causally connected to the protected activity." *Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 845 (8th Cir. Sept.11, 2002)(citing *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir.1997)). Kimco contends the second and third elements are lacking.

██ Josephson identifies the relevant adverse employment actions as (1) Haines'

reprimand; (2) Haines' instructions to his staff not to talk to her; (3) Haines' comments to other employees that Josephson was a "nothing" and the like; (4) a reduction in her responsibilities; and (5) elimination of her reimbursement for mileage while running errands. Only employment actions which have a "materially adverse impact" on an employee's terms and conditions of employment qualify as adverse employment actions. *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 684 (8th Cir.2001). Typically, a change "in pay, benefits, seniority, or responsibility" suffices. *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 715 (8th Cir.2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001). Changes in nontangible working conditions, or changes that work no materially significant disadvantage do not. *Jones v. Fitzgerald,* 285 F.3d 705, 714 (8th Cir.2002); *Sowell,* 251 F.3d at 684.

 Turning to the alleged adverse employment actions, a formal written reprimand may be an adverse employment action, but here Haines' reprimand was withdrawn when Josephson complained with no apparent impact on her employment.

 Josephson testified that after she complained to him about Hartschen's hiring, Haines spoke to her only when he had to. (App.56). The only evidence of Haines' alleged instructions to other employees not to talk to Josephson is what other employees told Josephson about what Haines told them. No affidavits have been produced from the three individuals to whom Haines allegedly said this. Josephson did not testify to the degree to which, if any, other employees followed these instructions. Haines admitted only that he told two employees not to discuss what was going on out in the field with Josephson, but that they could talk to her about other things. The silent treatment by Haines, or others, is a non-tangible change in working conditions of a type the Eighth Circuit has held does not constitute an adverse employment action. *Jones,* 285 F.3d at 714; *Williams v. City of Kansas City,* 223 F.3d 749, 754 (8th Cir.2000). The evidence of Haines' comments to other employees that Josephson was "nothing" and a "simple secretary" is also based on what other employees told Josephson. She recalled three times between November 1998 and January 1999 when statements of this type were reported to her by other employees. (App.55). The hostility reflected in these comments also does not rise to the level of an adverse employment action. Josephson identifies no evidence that these few remarks had any impact on the terms and conditions of her employment. *Jones,* 285 F.3d at 714 (citing *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997)).

 The claimed changes in Josephson's responsibilities have to do with the fact that after Hartschen was hired, certain payroll, hiring and ordering functions Josephson had been doing were transferred to Hartschen and Josephson assisted him. (App.54). Also, Josephson was no longer asked on occasion to help clean buildings. (*See id.*) Josephson does not articulate any basis to believe that these adjustments in her duties were materially disadvantageous to her. Finally, the claimed elimination of Josephson's mileage reimbursement is factually contradicted by Kimco's business records (which show she continued to be reimbursed) and was not significant enough in amount (about $10 per week) to constitute a materially adverse impact.

For all of these reasons the Court concludes Josephson has not identified evidence from which a reasonable fact finder could find she was subjected to actionable adverse employment action.

■ Kimco also challenges the evidence of a causal connection, pointing out that Josephson relies solely on the timing of the various items of claimed adverse employment actions in relation to her complaints about the hiring of Hartschen. While a close temporal connection between protected activity and an adverse employment action may justify an inference of retaliatory motive, "[g]enerally ... more than a temporal connection ... is required...." *Buettner,* 216 F.3d at 716; *see Sherman v. Runyon,* 235 F.3d 406, 410 (8th Cir.2000).

In this case the Court does not believe the temporal connection alone is sufficient to establish the causation element with respect to the arguably tangible items of claimed adverse employment action. Haines reprimanded Josephson for protesting the termination of an employee in the presence of new applicants, being disrespectful, and not preparing a letter as directed. That the incidents occurred is not disputed, Ford set the reprimand aside because Haines had "stacked" several complaints in a single reprimand. (App.12, 93).[4] Josephson's complaint was that Haines had not reprimanded male employees for similar conduct. (App.43). It is not surprising some of the duties Josephson had been performing would be assigned to Hartschen upon his arrival. The record does not indicate how the claimed mileage elimination came about. Josephson does not recall what Haines may have said about it, and recalls all Ford said was that another employee ran errands and did not get reimbursed. (App.55).

## C. *Constructive Discharge*

■ To prove constructive discharge, plaintiff must show that she was subjected to working conditions intended

to force her to quit or the result of which made it reasonably foreseeable that she would quit. *Duncan v. General Motors Corp.,* 300 F.3d 928, 935 (8th Cir.2002); *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998). The working conditions must be "so intolerable as to cause a reasonable person to resign." *Duncan,* 300 F.3d at 935. "Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment." *Jones,* 285 F.3d at 716. Josephson relies on the conditions described above created by her supervisor, Haines, over a relatively brief period of about three months. In kind, degree, and length of time the conditions described by Josephson are far short of satisfying the objective standard for intolerability as articulated and applied in the case law. *See Duncan,* 300 F.3d at 935 (offensive sexual, disrespectful, and disparaging conduct and comments over a two-year period not sufficient).

■ Beyond this, an employee has an obligation "not to assume the worst and not to jump to conclusions too quickly." *Duncan,* 300 F.3d at 935. The employer is entitled to a reasonable opportunity to work out the problem. Ford met with both Haines and Josephson on December 11, 1998 in an effort to work out the difficulties between them. He rescinded the reprimand. Josephson viewed Ford as a person she could go to with problems. Ford discussed the office situation a couple times with her after December 11 and, as noted, discussed and was supportive of her interest in an area manager position even if he did not, in Josephson's view, offer her a specific position. It is undisputed that in discussions with Josephson in January 1999 Ford told her he would try to "make

**4.** Josephson's denials with respect to the basis for the reprimand are not adequately supported by citation to the record. LR 56.1(b).

things work out" for her at Kimco and was willing to work with her to obtain an area manager's job. As late as early February of 1999 Ford told Josephson he would personally come to Des Moines to oversee her training and told her "we will make this work." Josephson did not attempt to go higher in the Kimco organization than Ford. In view of Ford's support and efforts to work out Josephson's problem with Haines, which were ongoing when she quit, it would be difficult to sustain a finding that Josephson gave Kimco a reasonable opportunity to work out the difficulties she felt she had with Haines.

### IV.

Defendant's motion for summary judgment is **granted in part and denied in part**. It is granted with respect to all claims except the failure to promote claim. That claim will come on for trial as presently scheduled on March 3, 2003 with final pretrial conference on February 20, 2003.

IT IS SO ORDERED.